UNITED STATES *v.* P. R. DREYER, INC. (No. 4315) [1]

---
[1] C. A. D. 162.

326

United States Court of Customs and Patent Appeals, March 31, 1941

*Charles D. Lawrence*, Acting Assistant Attorney General (*Richard F. Weeks* and *Frank X. O'Donnell, Jr.*, special attorneys, of counsel), for the United States. *Daniel P. McDonald* for appellee.

[Oral argument December 11, 1940, by Mr. Weeks and Mr. McDonald]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

This is an appeal by the Government from a judgment rendered by the United States Customs Court, First Division, awarding appellee recovery of customs duties collected at the port of New York upon importations of merchandise entered as origanum oil.

Two protests are involved, the cases having been consolidated for trial.

Protest 944578–G/1083 covers fifty drums of oil shipped from Spain. Protest 948193–G/4010 covers one drum of oil shipped from Morocco.

In both cases, the collector classified the merchandise under the last clause of paragraph 60 of the Tariff Act of 1930 as modified by the Reciprocal Trade Agreement between the United States and France, T. D. 48316 (69 Treas. Dec. 855). Said paragraph, when divided into three clauses, and omitting provisos, reads:

PAR. 60. Perfume materials:
[1] Ambergris, castoreum, civet, and musk, grained or in pods, 20 per centum ad valorem;
[2] anethol, citral, geraniol, heliotropin, ionone, rhodinol, safrol, terpineol, and all natural or synthetic odoriferous or aromatic chemicals, all the foregoing not mixed and not compounded, and not specially provided for, 45 per centum ad valorem;
[3] all mixtures or combinations containing essential or distilled oils, or natural or synthetic odoriferous or aromatic substances, 40 cents per pound and 30 per centum ad valorem.

The importer claimed the merchandise to be classifiable (and, therefore, duty free) under paragraph 1731 of said act, reading:

PAR. 1731. Oils, distilled or essential: Anise, bergamot, bitter almond, camphor, caraway, cassia, cinnamon, citronella, geranium, lavender, lemon-grass, lime, lignaloe or bois de rose, neroli or orange flower, origanum, palmarosa, pettigrain, rose or otto of roses, rosemary, spike lavender, thyme, and ylang ylang or cananga: *Provided*, That no article mixed or compounded with or containing alcohol shall be exempted from duty under this paragraph.

Claim was also made under the nonenumerated paragraph 1558 at 10 or 20 per centum ad valorem, which claim was not pressed here or below.

It appears from the testimony and standard authorities cited and quoted in the respective briefs, that natural origanum oil is produced by a process of distillation of certain plants or herbs indigenous to sections of lands which border the Mediterranean Sea.

It also appears that an oil having the substantial characteristics of natural origanum oil is produced synthetically in foreign countries,

and to some extent in this country, from a coal-tar derivative. It is further shown that chemists have become adept at adulterating oils which may be sold to take the place of essential oils, which adulteration consists, in some instances, of using ingredients other than those derived from coal tar, and that, generally speaking, in order to simulate certain characteristics of certain essential oils and to make them respond to certain chemical tests, many different articles are used as adulterants, such as turpentine, alcohol, chloroform, fatty or expressed oils, and petroleum. Adulteration more difficult to detect consists in adding various synthetic constituents of chemical composition similar to those occurring in the natural oil, and these are so skillfully prepared as to render detection almost an impossibility, especially by the employment of tests mentioned in the texts. For a discussion of this subject, see Tariff Information Surveys on the Articles in paragraph 46 of the Tariff Act of 1913 (predecessor paragraph of which paragraph 1731 is a part) which covers essential distilled oils— Survey A–12, published in 1921.

It is the contention of the Government, as stated in its brief, that paragraph 1731, *supra*, was intended by Congress to include only natural oils; that paragraph 60, *supra*, was intended to cover all artificial combinations, or mixtures, of "natural or synthetic essential oils," and that "the record and the authorities establish conclusively that both the oils [meaning the oil imported from Spain and the oil imported from Morocco] now before the court are synthetic mixtures."

The contention of appellee upon this point is stated in general terms (followed by argument in more detail) in its brief as follows:

The provision for "origanum oil" in paragraph 1731, is without limitations or restrictions and includes all substances recognized in the wholesale trade of the United States as such.

The importer does not admit that the record shows that the instant merchandise contains anything not found in the natural origanum oil of vegetable origin, and asserts that if it were assumed that there were any foreign or adulterating substance in the imported merchandise, it would be in a negligible quantity (not over one-half of 1 per centum) so as to make applicable the rule *de minimis non curat lex*, and that the record shows that the goods at bar constitute a good delivery of origanum oil in trade and commerce.

The record consists of 120 pages, most of which contains the testimony of witnesses, all of which must be taken into consideration as bearing upon the instant issue, but most of same need not be quoted here.

The appellee at the trial submitted the depositions of Paul Pinel, chief chemical engineer of the company which produced and exported all the involved merchandise. His testimony was to the effect

that the imported merchandise was made from plant life and that no foreign ingredient was admixed with it; that he visited the Moroccan plant once every year and while there supervised the distillation of origanum oil. He stated that he had complete knowledge of its production, and that no foreign substance was added. He also stated that the "merchandise imported" was "actually uncompounded oil of origanum" and as to the Spanish oil he stated that he was present at its distillation and examined and analyzed the oil shipped, and that the oil was manufactured and designed to be used and was intended to be used for the specific purpose of perfuming soap.

In addition to the foregoing depositions, appellee produced the testimony of six witnesses, which testimony embraces nearly half a hundred pages of the record, and the material parts of which we will attempt to summarize in as brief a manner as seems proper under the circumstances.

All of the importer's witnesses, except Dr. Seil and Mr. Swan were directly connected with the importer.

Dr. Seil was a consulting analytical and research chemist. He testified that he analyzed a composite sample from the imported Spanish merchandise and that he determined from his analysis that it had the following characterictics: Specific gravity at 15° C., 0.9518; solubility, 2½ volumes of 70 per centum alcohol and 1½ volumes of 80 per centum alcohol; optical rotation at 25° C., minus 0.7 degree; refractive index at 20° C., 1.0583, and total phenols by absorption, 63 per centum; that he had determined its specific gravity by a pycnometer which he had previously standardized; that he had determined its solubility by taking one cubic centimenter of it and adding in small amounts of 70 per centum alcohol and noted the point at which he obtained a clear solution; that he found it would require two and a half volumes of same in 70 per centum alcohol, and that he proceeded in the same manner using 80 per centum alcohol which he found required one and a half volumes in 80 per centum alcohol; that he determined its optical rotation in a 100 millimeter polariscope tube; that in determining its refractive index he placed a few drops of the oil on a refractometer which he had carefully set to a temperature of 20° C. and took the reading, and that in determining the phenol content he followed the standard method (which is not in dispute here).

This witness recited standard authorities as to the characteristics of what was stated to be Spanish origanum oil, and gave as his opinion, based upon his analysis of commercial samples that he had carried out over a period of years, that the analysis made by him brought the involved merchandise well within the stated characteristics of the known natural Spanish origanum oil; that the imported oil fell within

the definitions of the standard authorities; that his analysis was a commercial analysis to determine the quality of the oil; that origanum oil always contains carvacrol, and that it is largely carvacrol. He stated that specific gravity, optical rotation, and refractive index were known as the constants of a liquid material, and that such constants exist not only in natural oil, but in synthetic oil; that he had heard of a synthetic origanum oil but had never seen one and had never analyzed one; that the constants may be determined not only of natural oils and oils produced from coal tar derivatives but of any liquid, even of water; that he believed he could produce carvacrol, which is the chief ingredient of the natural oil, by a synthetic process, if he had the working directions before him, and that he was certain it could be done and was being done. He stated that it would be possible to make a synthetic mixture that would have the same constants he found in the sample of the imported oil which he analyzed. He stated that he found nothing in the sample of the imported goods which he analyzed to indicate "any mixture." He was asked if his analysis revealed whether any of the carvacrol that he found in the oil was made synthetically, and he stated:

A. No; and I deny that any man can tell carvacrol synthetic from carvacrol natural, because they are the same thing.

Dr. Seil also said that carvacrols might be and were made from coal-tar distillates. He testified that the sample of the origanum oil which he analyzed had the characteristic odor of origanum oil, and that in his opinion the imported oil was not synthetic origanum oil. Being asked if the oil in question contained any ingredients not found in the natural origanum oil he answered "Not to my knowledge." He was also asked if he could tell by analysis whether the imported article was synthetic or natural, and he replied that "If pure carvacrol was added to this oil it would be impossible to determine." He admitted that the only way to determine whether such an oil was synthetic would be to ascertain if it contained some material foreign to origanum oil; that the constants he found in the importation showed that it was genuine oil.

Dr. Seil testified again in rebuttal. His testimony will be referred to later after we have recited the substance of the testimony of the Government's witnesses.

James Demarest, in the employ of the importer as an analytical chemist, testified concerning his analysis of the Spanish oil, and stated that he went through the essential steps recited by Dr. Seil and determined the specific gravity, optical rotation, solubility, refractive index, and phenol content of the oil; that he found the constants to be substantially as found by Dr. Seil. There was some slight variation in the figures, but we think the variation is immaterial.

He testified that his analysis brought him to the conclusion that the imported oil was "a good grade of origanum oil" and that he found no evidence of adulteration or mixture; that he fractionated the oil and tested each one of the fractions and reported to his employers that it appeared to be a pure oil; that he compared the result with the same result obtained in the same manner from origanum oil obtained by distillation and that in all essential details the analysis of the two kinds of oil, that is, the imported and the known pure oil, showed them to be alike in physical and chemical constants; that they were both good origanum oils; that the imported oil was a pure quality of origanum oil; and that he found no foreign substances that would indicate that either of the oils was not a pure origanum oil. He stated that the fractionation would have the tendency to separate out the adulterants, if any; that the plant origanum was not commercially grown in this country but was listed in seed catalogues as a garden curiosity, and that he had distilled in the importer's laboratories the pure origanum oil from imported origanum plants. He stated that he determined the phenol percentages of the oil by observation of the alkali and observed the odor of the phenols; that he did not try to determine how much of the phenol was carvacrol because it is variable; that carvacrol occurs in origanum oil; that thymol, which is a phenol, also occurs in such oil, and that carvacrol could be produced synthetically.

Importer produced the testimony of Charles A. Swan, an analytical chemist and manager of the factory for Aromatic Products, Inc. of Springdale, Conn. After fully qualifying as an analytical chemist of essential oils, he testified that the analysis of Dr. Seil showed certain constants to be those for pure origanum oil, and that he would accept the oil of these constants as being a pure oil. He stated that he could not tell from the smell of the various fractions produced by the witness Demarest that they were pure; that he would have to take a paper and put them thereon and compare them, but that the oil represented by the analysis of Dr. Seil would be a good delivery for origanum oil.

Charles Fishbeck, who was employed by the importer in buying and selling essential oils, stated that in his opinion the constants found by Dr. Seil in the analysis of the imported oil came within "figures that I would consider a pure oil."

At the conclusion of the importer's testimony as to the Spanish oil, the substance of which is hereinbefore recited, the Government produced the testimony of five witnesses. The first witness, Arthur B. Mandell, testified to the taking of the sample, a matter which is not in dispute here.

Government witness Arthur Hafner stated that he worked for the Orbis Products Corporation of New York City and that it made

synthetic origanum oil, and that it had offered the synthetic origanum oil recently for sale but had not sold any.

Arthur I. Gebhardt, a Government chemist, after disclosing ample qualifications as a chemist, testified that he analyzed an unquestioned sample of the merchandise at bar and such analysis was made by "our customary procedure for an oil of that type." He stated that from past experience "we" found that the constants of essential oils generally do not have a great deal of meaning; that he did not take "any of the normal so-called ordinary constants on the straight essential oil as received"; that he removed the phenol portion and distilled the portion which remained; that from that he determined certain constants and it was ascertained that the optical rotation obtained from the test of the separated portions was negative for every fraction and that that indicated from past experience with both good and bad origanum oil that the sample was not a pure origanum oil. The first sample being mostly consumed, another sample of the same shipment of oil was requested and obtained. The authenticity of this sample is not questioned. Concerning it, we quote the following from his testimony:

Q. Now, after receiving this sample, what did you do, and what did you find, if anything?—A. Continued to work as I had originally started on the first sample, in order to get some further evidence other than the optical rotation, that the sample was not a pure sample. The fractionation, the breaking up of the oil into fractions and portions was again repeated, with the same result, showing negative optical rotations. In this case additional work was done on the phenol portion of the oil. The phenols themselves were further fractionated and distilled in the first portion of the distillate. That is, as you start to distill the first part will come over has a very unusual odor. It resembled orthocresol. The fractionation was continued, and this first portion was kept separate. It was afterwards tested to see whether we could detect the presence——

Q. Did you test it?—A. I tested it to see whether we could detect the presence of orthocresol, which had its characteristic odor; and the test showed that it did contain a small amount of this coal-tar intermediate, and also orthocresol.

Q. What did the test consist of which revealed the presence of the orthocresol?—A. Since it is practically impossible to separate absolutely by distillation the orthocresol from the carvacrol it was necessary to remove the carvacrol by chemical means, and this was done; and then the portion that remained after removing the carvacrol was tested for orthocresol and found to show the presence of a small amount.

The witness said that he was familiar with the origanum plant from which pure origanum oil was made; that he had analyzed pure origanum oil and that orthocresol does not appear in the distillations made from the plant; that orthocresol is from coal tar; that when the origanum plant is distilled it results in obtaining carvacrol and that the carvacrol could be made synthetically by various means, one of the means being by isopropylating orthocresol. He said that the presence of the orthocresol indicated to him that the carvacrol, or some of the carva-

crol at least, contained in the sample had been prepared synthetically from orthocresol and "had carried with it, as usual in cases of this kind, small amounts of one of the products which are used in carrying out the chemical reaction," and that the origanum plant was not found growing in any quantity in this country. He stated that he had analyzed oils which were not natural origanum oil, but he could not say whether they were "out and out synthetic" or just mixtures, and that he was familiar with the constants of the synthetic or mixed oils. We quote the following from his testimony:

Q. Can you tell us how the constants in such oils compare with the constants in a pure origanum oil?—A. Yes. In a pure oil these optical rotations that were determined on these fractions always show positive in the first few fractions, or in the greater number of the fractions. Towards the end it becomes negative. The last part to be distilled off, it becomes negative.

Judge SULLIVAN. Notwithstanding that they were pure?

The WITNESS. Notwithstanding that the oil was pure.

A. (Continuing.) In the samples which have been mixed or adulterated, in other words, in the oil that is [not] distilled directly from the plant we find that they may show negative, optical rotation in the negative, and go back negative or something similar to that. They don't show continual positive rotation in the beginning. They either fluctuate or they remain negative through the entire range of the fraction. That is the difference between the pure and the admixed oils.

Q. Now, in your opinion, Mr. Gebhardt, was the oil that you analyzed, the oil which was the subject of the importation now before the court, a pure oil or a mixed oil?—A. In my opinion it was a mixed oil.

He testified that his system of analysis, the one which was followed by the Government chemists in analyzing essential oils, was not disclosed in the textbooks, but that they found it proved satisfactory and gave information which could not be obtained in any other way, and that his tests were verified by a number of determinations of the quality of pure oil which had not been admixed; that he had been analyzing origanum oil, which he stated to be quite a common importation, over a period of possibly 2 or 3 years; that he did not apply his tests to the oil but to the fractions into which the oil had been reduced; that after the separation he analyzed both the phenols and the nonphenols and that the optical reading of the nonphenol portion was less than zero; that this is the portion that did not contain the orthocresol, the orthocresol being found in the phenol portion; that he took the optical reading of that part of the oil which did not dissolve in caustic soda and that this showed the negative reading before referred to; that he never found any pure oils that gave negative readings under such conditions. He said that the authors in stating that some kinds of origanum oils have positive and some have negative readings were referring to the origanum oil itself and not to the fractions; that if the reading showed positive at the beginning and remained positive until near the end this would indicate that it was pure

334

oil, and that in this contention he is backed up by the Government's laboratory experiments carried on over an extended period. We quote the following:

X Q. When your laboratory makes a test of oil and pronounces it pure, isn't it a fact that you have to follow the tests of Gilgemeister and Parry?—A. Such standard works as those give the constants of the original oil. Our experience has shown that those constants are very carefully striven for by people who wish to adulterate oils, and quite a great deal of success has been obtained in getting those constants. As a result past experience has shown that those constants do not mean a thing; and I can show you plenty of literature to that effect.

\*  \*  \*  \*  \*  \*  \*

X Q. How did you separate the carvacrol from the orthocresol?—A. The first two fractions of the phenol portion, which, as I say, has this odor which would recall orthocresol, was dissolved in sodium hydroxide. It was then shaken out with ether quite a number of times, which removed from this solution the carvacrol. It does not remove any coal-tar phenols. After the removal of the carvacrol the solution is acidified, and this separates the orthocresol from any coal-tar phenols that might be present other than the carvacrol that was then extracted, and the tests were made on the portion extracted.

X Q. How did you identify the orthocresol?—A. It was identified by a test with bromine, water and ammonium, which with coal-tar phenols develop a characteristic bluish-green color.

X Q. I believe that you testified that you did not take the optical rotation of the original oil as imported. Is that correct?—A. Yes, sir.

He stated that if carvacrol was properly made artificially, he didn't believe anyone could tell the difference by smell; that the location where the plant was grown could not be responsible for the presence of orthocresol. He stated that "There is no reference that we were ever able to find in any literature indicating any evidence of orthocresol being found in any natural oils, and that it goes against the theory of the formation of the essential oils in plants." We quote another statement by the witness:

A. This bromine-ammonium test appears to be a specific test for coal-tar phenols; furthermore, the fact remains that I could not get the tests on other fractions of this same oil—I did get the test on this third fraction. Furthermore, to elaborate a bit, I added a small amount of orthocresol to one of these fractions, then proceeded to extract it by the same method which I used in extracting this first fraction that I am referring to, and I got a nice test for orthocresol, because I had put it in there. As a result of those tests of that kind, which we call blanks, the reasoning was fairly conclusive that this must have been present in the oil, and checked with the blank determination.

He stated that he found only a small amount of orthocresol in the fractions. He was indefinite as to the amount, saying that it was probably one-quarter of 1 per centum of the whole oil. He testified that he made his distillation under vacuum; that the isopropylation process of manufacturing orthocresol appears to be of considerable interest since there are a number of patents on the subject, and that orthocresol was a very cheap product.

Judge Sullivan asked him: "Now, would that slight extent [presence of a small quantity of orthocresol] make an entirely original oil impure?" He replied:

The Witness. Here is the point in respect to that. You see this carvacrol, which is the main constituent of this oil in question, is made today synthetically from orthocresol. Now, in the chemical preparation of carvacrol from orthocresol it is almost impossible to remove every last trace of the orthocresol which has not entered into the chemical reaction. In other words, the reaction is not 100%. Some small amounts of the materials which are put together remain in their original form. Then after the preparation is completed it is usually subjected to a purification operation such as distillation or something similar. Those operations are never of such a refined character that they will remove all the last traces of these other materials. As a consequence small amounts present act as indicators as to the original substance from which the product is manufactured.

Judge Sullivan. That doesn't answer my question at all. The question I have in mind is whether or not this very limited amount of orthocresol which is found in the merchandise involved renders it impure?

The Witness. Well, it doesn't render it impure in the common sense of impurities. As an impurity the orthocresol is in such small amounts that the product is actually impure, but it shows that the product contains a large amount of carvacrol, which, apparently, had been made from orthocresol, and therefore it is not a pure oil.

He stated that orthocresol was a phenol and was purely a coal-tar product. He stated that natural carvacrol and synthetic carvacrol, as far as their chemical compositions are concerned, are chemically the same, but that orthocresol never comes from a plant. Concerning making the analyses for the Government he said:

A. Our object is to determine whether the oils are pure essential oils in this sense; such oils would be free under paragraph 1731, or to determine whether it is a compounded or admixed oil, which would be dutiable under some of the other paragraphs.

Herbert W. Eckweiler, assistant chief chemist for the Government at the port of New York, stated that he observed the tests hereinbefore mentioned, made by Mr. Gebhardt; that the tests were made with bromine and ammonium; that he examined the result obtained with the polariscope with reference to the rotation of the various fractions, and that the tests in his opinion indicated that the oil was made from synthetic carvacrol which in all probability came from a coal-tar source. From his testimony we quote:

The Witness. The carvacrol that is obtained from the plant does not contain as an impurity the orthocresol. The carvacrol which is obtained by chemical means from coal-tar does contain orthocresol in very small quantities; consequently the presence of that orthocresol indicates to me that the carvacrol present was not all from the plant; that there was some of it that was put there by deliberate solicitation, you might say.

He stated that it was the presence of the orthocresol and not the quantity of it that indicated that the carvacrol was not from plant life; that there was always carvacrol in unadulterated origanum oil

but no orthocresol; that there were two or three tenths of 1 per centum of orthocresol in the fraction analyzed; that he had no commercial experience in analyzing origanum oil. He stated that, under certain circumstances, there might be synthetic carvacrol produced which would not have orthocresol in it.

Harold B. Mead, long in the Government service in connection with its chemical laboratories, stated that he has intensively examined origanum oils for a period of 8 years and made analyses of it many hundreds of times; that he supervised the analysis and making of the report concerning the importation in question; that he observed the aforesaid tests made by Mr. Gebhardt, and that the smell of orthocresol was present throughout the test. He said the tests showed that the oil in controversy was composed largely of synthetic carvacrol; that no definite figure could be stated, but that the presence of a small amount of orthocresol indicates the presence of a large amount of carvacrol obtained from a synthetic source and not from the natural oil. He said that they (meaning the Government chemists) did not rely solely upon the rotation test but on a number of tests; that synthetic carvacrol probably could be made without any trace of orthocresol. He stated:

A. There was undoubtedly carvacrol in the oil; there was also a small amount of orthocresol. Since it was one of the methods of obtaining carvacrol this method always leaves traces of small amounts of orthocresol in the carvacrol, the natural assumption is that the carvacrol was present, was obtained from the orthocresol, since it contained only a small amount of orthocresol.

In rebuttal, the importer reexamined Charles Fishbeck who stated that he was vice president of P. R. Dreyer, Inc., the importer, and that the presence of a small amount of orthocresol would not cause him to reject an order of origanum oil as a bad delivery of the same. He stated that if he was purchasing origanum oil under the name of origanum oil, he would expect to get the natural product; that if somebody sold him a synthetic oil they would tell him it was that kind of oil; that if it was found to be synthetic oil he would reject it, and that he would regard an oil containing between one-quarter and one-half per centum of orthocresol as a good delivery for origanum oil.

Importer's witness, Charles A. Swan, was recalled and stated that he would regard an oil containing between one-quarter and one-half per centum of orthocresol as a good commercial delivery for origanum oil; that he had purchased and had experience with origanum oil; that when he purchased origanum oil he expected to get a pure oil and not a synthetic oil and that if the oil was synthetic he would not consider it a good delivery. When asked if he would consider the kind of oil imported a pure oil he answered: "I would consider it a pure oil on the face of it."

Importer's witness James Demarest was recalled. He testified that he would consider an oil containing between one-quarter and one-half per centum of orthocresol a good delivery for an oil of origanum.

All the foregoing testimony related to the Spanish oil which consisted of fifty barrels covered by protest 944578–G/1083.

The testimony of the parties relating to the Moroccan oil covered by protest 948193–G/4010 differs in certain respects hereinafter pointed out from that relating to the Spanish oil, and we will at this time set out the substance of the same.

James Demarest, recalled as a witness on behalf of the importer, stated that he analyzed this oil and made a written report of his findings thereon. The witness read into the record the various constants he found to exist in this oil as follows:

A. Specific gravity at 25 degrees Centigrade, 0.9426; solubility in 70% alcohol, 2.4 volumes; *optical rotation, not determined;* refractive index, 1.5102; phenol content, 67%. That is all. [Italics ours.]

The witness stated that he made a smelling test of the oil. Based upon these tests he stated that the sample represented a good grade of origanum oil; that he saw no evidence whatever of adulteration, and that the procedure in regard to the Moroccan oil was substantially the same as that which took place in analyzing the Spanish oil heretofore recited in his testimony.

Dr. Seil, whose testimony with reference to the Spanish oil has been, in substance, herein stated, was recalled, and concerning the Moroccan oil stated that, basing his answers upon his knowledge of origanum oil and the constants which were said to exist in the analysis of Mr. Demarest, he would regard the oil which the exhibit represented as a good grade of origanum oil; that it had the normal constants of origanum oil and fell well within many of the constants set forth in the well-recognized authorities; that he made no analysis of it himself but was satisfied with the analysis made by Mr. Demarest.

Charles Swan and Charles Fishbeck, who had previously testified as to the Spanish oil, were recalled, and concerning the Moroccan oil substantially duplicated the testimony of Dr. Seil last referred to.

Fred C. Theile was called as a witness by the importer and stated that he was president of the importing company and had knowledge of the particular drum of Moroccan oil involved; that he became familiar with it after its purity had been questioned by the Government; that he caused the analysis of it to be made by his company's laboratories; that he had had technical training as a chemist and had been buying and selling essential oils including origanum oil for 15 years; that he did not examine the oil himself, although he smelled it, and to his knowledge it had the proper smell for origanum oil, and that this odor was an essential characteristic of origanum oil. He

stated that, basing his knowledge upon the smell of the oil and the findings of Mr. Demarest, he was of the opinion that the oil was a good delivery for origanum oil; that he sold it as a good grade of origanum oil and had no complaints from customers; that it was used as origanum oil; that he bought it as a natural unadulterated unmixed oil and that if at the time he received it there had been anything found to suggest it was synthetic or mixed or adulterated it would have been rejected; that his company did not sell synthetic, mixed or adulterated oil in compliance with an order for natural oil and that synthetic oil was sold as an imitation oil; that they bought imitation oil and sold it as such; that his firm sometimes manufactured imitation origanum oil; that sometimes in manufacturing the imitation oil they used coal-tar products, and sometimes not, depending upon the type being manufactured; that you can make a substitute for carvacrol out of coal-tar products such as orthocresol; that there were no definite constants for imitation origanum oil; that none were required and that it was sold mostly on odor for technical use; that one could find constants for such oil if he looked for them and that the constants in imitation oil are not necessarily the same as the constants for natural oil; that imitation oils are sold on price and not sold according to constants; that the constants of imitation oil vary from those of natural oil to a marked extent, and that the constants of an imitation oil would not always fall within those found to exist in the sample of the imported oil analyzed by the importer's chemist, and that he never did know of a synthetic origanum oil which had the exact constants found by Mr. Demarest.

At this point, the Government recalled Arthur I. Gebhardt, whose testimony relating to the Spanish importation here involved has in substance heretofore been stated, and he testified that he made an examination of the sample of oil taken from the drum exported from. Morocco, the analysis being carried out in a manner similar to that which was carried out with regard to the Spanish oil, and the results of the analysis showed that the sample was a mixture of aromatic chemicals. We quote the following:

Q. Will you give us a little more in detail, please, what findings led you to that conclusion?—A. The oil was separated into a phenol portion and a non-phenol portion, which are the two main types of substances which comprise this origanum oil; that is the phenol and the non-phenol. The non-phenols were then distilled in the same manner in which the previous sample of Spanish oil was distilled, into fractions. The optical rotation of these fractions was then determined, and the results of this optical rotation determined showed that in the beginning the fraction showed a positive rotation; in the middle they showed a negative rotation, falling to zero; and then at the end finally showed a positive optical rotation again. This fluctuation of optical rotation, from plus to minus, to plus again, based on a considerable amount of work done in our laboratory, showed itself to be not characteristic of a good origanum oil. In other words, a good origanum oil does not show this type of optical rotation.

He stated that he made no attempt to find the constants of the whole oil, but that he did make a constant test of a pure plant oil which was distilled by the importer and which will be referred to herein later. He stated that in analyzing the Moroccan oil he separated the phenols and the nonphenols with sodium hydroxide and distilled the nonphenols; that they were generally called terpenes; that these terpenes were distilled into fractions and that optical rotation of the fractions or terpenes was obtained. After obtaining the optical rotation of these fractions, he stated that he compared the results obtained with those obtained from a considerable number of genuine essential oils; that while the process was somewhat peculiar to the Government's own laboratory, it had in a general way been mentioned in the literature; that he did not examine the Moroccan oil for orthocresol; that that test was eliminated and that he based his conclusion exclusively upon the optical rotation; that in testing pure oils he invariably obtained a fixed result, and that the optical rotation first would show plus and toward the end of the fraction a minus was obtained. In answer to the question as to how he accounted for the constants in the pure oil as a whole being similar to those of the oil in controversy which he regarded as a synthetic mixture, he said:

A. My explanation of that is, as I have testified previously, everyone familiar with this type of product knows that the constants can be so juggled in imitation oils that they will be the same as the constants you will find in the literature. So it has become necessary to go further than that, in order to determine whether the oil is a natural oil, or whether it is a synthetic mixture. I do not imply that the constants are not correct. I merely mean to say that the constants of themselves do not necessarily prove that it is a pure oil.

He stated that the optical rotation of the fractions of the Moroccan oil was considerably different in respects heretofore indicated than the optical rotation of the same type of fractions obtained from the natural oil. We quote:

The WITNESS. The differences are indicated by the fact that we make a certain determination, which we call either plus, zero, or minus, called optical rotation. The optical rotation which we find on oils which were put in paragraph 1731 always remain plus up until nearly the very last fractions; then they become minus. The optical rotation on the oil in question, that is, on these fractions, were plus, minus, plus, minus, plus. That is the difference; and that is based on past experience with many genuine oils in our laboratory.

He said that he could not name the impurity; that he did not actually get out of the imported oil any foreign substance as such, but that the tests showed that logically there was a foreign substance there; that the place where the material grew might have some effect upon the optical rotation of the whole oil and that the method of its distillation and the time of year in which it was harvested and the type of plant

used might also have some effect. He distinguished the whole oil from the fractions analyzed in the manner stated in his previous testimony. During the examination of this witness it was conceded by the Government that while it had something to put its finger on in the Spanish oil, to wit, orthocresol, there was no definite adulterant isolated or its name ascertained in the case of the Moroccan oil. The witness explained that the methods of adulteration and the materials used were such that it was not always possible to arrive at a definite conclusion as to what the adulterant consisted of; that carvacrol does not have any optical rotation; that if pure carvacrol were added to the instant importation it would not change its optical rotation; that if *pure* synthetic carvacrol were added to the instant importation it would not change its rotation, and that the fact that the optical rotation of the terpenes in the instant importation differs from that of the terpenes of the natural oil suggests the presence of an adulterant.

What seems to us to be the most important portion of the testimony of Mr. Gebhardt in connection with the Moroccan oil related to a comparison of the imported merchandise with the natural origanum oil made in the importer's laboratory from origanum plants imported from Morocco at the request of the Government. The question of a possible difference between the plant grown in Morocco and that grown elsewhere had been stressed by Thiele in conversations he had with witness Gebhardt in the Government laboratory. Concerning this subject matter, Gebhardt stated:

A. Mr. Theile pointed out that since this was from a hitherto unused botanical species of origanum plant, and that since it had been grown in a country where origanum had not previously been produced, it might be possible that this oil would have constants which would be different, or different characteristics, which might account for the findings which we had obtained on the analysis which we had already made and reported. We agreed that from our knowledge such things could be possible in the case of essential oils. And in order to determine whether this oil might be different we suggested that Mr. Theile import some of the herb from which this oil was being prepared in Morocco, and that it be distilled here, and that the still would be so arranged and designed, and the process so carried out as to simulate as far as possible the conditions under which the oil was distilled in Morocco. Mr. Theile agreed to this and subsequently imported the herb and notified us.

I went to P. R. Dreyer's plant, and a large batch of this herb was distilled at that plant. As I recollect, without looking at my notes, we distilled several pounds of the essential oil. That oil was taken by me back to the laboratory and was analyzed in identically the same manner in which the imported oil had been analyzed. The analysis of the oil tested under my supervision showed the normal characteristics of a natural origanum oil, and was considerably different from the imported oil in question, as far as analytical results obtained.

Presiding Judge McClelland. How did they differ?

The Witness. They differed in this property of optical rotation. This oil tested under my supervision showed—I want to refer to my notes on that to be sure. This oil showed a positive optical rotation throughout all of the first frac-

tion. Near the end it showed a slight negative optical rotation; and then at the very end a slight positive optical rotation.

\* \* \* \* \* \* \*

A. (Continuing.) The other one showed a positive optical rotation, then a negative, then a positive, or zero, and then a negative. In other words, the results of the examination of a large number of samples of these oils has shown that when they are natural oils, distilled from the plant, they always show a positive optical rotation up until nearly the very end of the distillation. At the end of the distillation they become generally negative, and may come back slightly positive.

Our experience with adulterated oil or mixtures has shown that they are evidently put together in such a manner that the optical rotation may be negative at the beginning instead of positive. It may come out positive in the middle and go back to negative, come up positive and go back negative at the end. That is the difference we have found between the genuine natural oil and the synthetic or an oil made by compounding mixtures.

By Mr. WEEKS.

Q. In your experience, Mr. Gebhardt, with essential oils have you found the constants to be reliable as a test?—A. If the oil is a good oil the constants will agree with the constants given in the literature; but the fact that they do agree does not necessarily mean that the oil is a good oil, because since the constants are used by very nearly all people who handle or deal in essential oils as a criterion, or as a general criterion of their purity, those who prepare essential oils try very hard to attain these constants, since it is possible that the purchaser may base his analysis on the reading of those constants, and buy the oil nevertheless; and oils can be spurious and still have the constants given for them in the literature.

Harvey A. Seil at this point was recalled as a witness for the importer, and he referred to the orthocresol test made on the Spanish oil by saying that it would not be regarded as conclusive as determining a coal-tar substance. He said there were other substances occurring in essential oils which would give the same reaction.

James Demarest was also recalled, and he stated that he did not regard the method employed by Mr. Gebhardt in analyzing the Spanish oil to be a safe method. He stated that in making his analysis he did not "go after orthocresol at all." He said that he would not consider the presence of orthocresol as an indication of adulteration and that he did not think the variation which was reported in the optical rotation tests referred to by the Government was significant. He stated that if he were handed a sample of the oil in issue and asked to tell whether or not it contained any synthetic oil, he doubted if he could do so.

The trial court made no definite finding as to whether or not there was orthocresol present in the fractions analyzed by the Government chemists or whether there was any other impurity indicating that some adulterant had been added. It held that one-fourth or one-half per centum of orthocresol, if in the Spanish oil, was not shown by the record to have been added for commercial reasons or purposes, and, therefore, was negligible under the principle *de minimis non curat lex,*

and that even if it be assumed that the merchandise consisted of synthetic origanum oil, it was entitled to free entry, nevertheless, under certain decisions by the United States Customs Court. It made no distinction between the proof in relation to the Spanish oil and that relating to the Moroccan oil, the latter not having been tested for orthocresol.

If the trial court had weighed the evidence with respect to whether it did or did not show the presence of orthocresol in the Spanish oil and that such presence did or did not show an adulteration, and had weighed the evidence relating to the Moroccan oil, we would have been helped materially in deciding the instant issue. It is readily understood by us, in view of the trial court's conclusion, why it regarded it as unnecessary to weigh the evidence as to the Spanish oil, but it is difficult for us to see for what reason it regarded it as unnecessary for it to pass upon the evidence relating to the Moroccan oil.

We have weighed the testimony and considered every phase of it, and we cannot escape the conclusion that the record shows that the Spanish merchandise contained orthocresol and that the presence of orthocresol suggests definitely that such merchandise was either a mixture containing carvacrol made synthetically from some coal-tar distillate or that it was wholly a synthetic product made from orthocresol.

We agree with the contentions of the Government that the significance of one-quarter to one-half of 1 per centum of orthocresol does not rest in its quantity in the imported merchandise, but in the fact that it was present. Aside from the possible construction of one statement made by the witness Demarest that he did not regard the presence of orthocresol as being an adulterant, the testimony is positive and unquestioned that the presence of a small amount of orthocresol suggests the original inclusion of a large amount of artificial carvacrol. If the carvacrol came from any other source than from the plant, it follows, we think, that under the proof as a whole the Spanish importation must necessarily be a mixture of some kind, containing artificial carvacrol, or a straight synthetic origanum oil (one of the Government's witnesses referred to it as "out and out synthetic") made from a coal-tar product and which contains traces of orthocresol.

As to the Moroccan oil there was no test made for orthocresol. The oil in controversy was fractionated and analyzed. A test was given the fractions and this test was compared with a test given pure origanum oil produced from plants shipped from Morocco. No question was raised as to the purity of the oil produced from the plants shipped from Morocco and furnished by the importer and manufactured in its laboratories. In arriving at the conclusion that the Moroccan oil was adulterated, the Government chemists relied solely on the difference

in the optical rotation of certain fractions of the imported oil and that of the known pure origanum oil made from the Moroccan plants as aforesaid.

While the importer has tried to point out that the optical rotation test under such circumstances is not a safe one, nothing of a convincing nature has been shown us that there could exist such a difference in the optical rotation of the two materials and both be pure, natural origanum oil. Importer has not satisfactorily explained the cause of the difference in the results of the tests, and upon this record we must ascribe the difference to the fact that the component materials of the respective products differed. The optical rotation test of the Moroccan oil shows that there was some foreign substance in it which was not in the natural Moroccan oil made from the plant, and it follows that the imported Moroccan oil was either a mixture embracing ingredients which are not contained in natural origanum oil or was a straight synthetic product.

Appellee entered the trial of the case with the burden of proving that the classification by the collector of the merchandise in both entries was erroneous, that is to say, that the oils were not mixtures dutiable under the pertinent provision of paragraph 60, *supra*, and that they were properly dutiable under one of the paragraphs claimed. Assuming that appellee made a *prima facie* case before the Government proceeded, it must be determined from the evidence as a whole whether or not it shows that the material is not such a mixture. Since the evidence shows that it was either such a mixture or a straight synthetic article, appellee has not shown, and the record does not show, that it was not such a mixture. Unquestionably, a showing that an article may be either a mixture or a straight article is not a showing that it is not a mixture, and for the purposes of this case we are assuming without deciding or even intimating that the straight synthetic article to which we have made reference is not a mixture within some pertinent provision of said paragraph 60.

As hereinbefore stated, appellee in its brief states but does not emphasize what may be regarded as a contention that free list paragraph 1731, being without limitations as far as the instant merchandise is concerned, includes all substances recognized in the wholesale trade of the United States as such, and therefore would include certain mixtures and straight synthetic products known in the wholesale trade as origanum oil. Appellee's case seems to be buttressed, for the most part, upon the theory that the record does not show that anything is contained in the imported merchandise except that which came from the origanum plant. Assuming, however, that it is contended here that since the proof shows that the merchandise is either a mixture or a straight synthetic product, it comes within free list

paragraph 1731, it is, in our judgment, sufficient to say that if appellee has failed to show that the importations should not be classified as mixtures within paragraph 60 as classified by the collector, it follows, of course, that it has not proved that they should be regarded as free merchandise under paragraph 1731.

We, therefore, conclude that the judgment of the United States Customs Court which held that the involved merchandise was free of duty under paragraph 1731, which was in effect sustaining the protests of appellee, was erroneous. It should have overruled said protests, and its judgment is *reversed.*

### DISSENTING OPINION

GARRETT, Presiding Judge:

I am of the opinion that the record here discloses that there are two classes of what is known as origanum oil, one being an oil produced from plants by distillation and usually referred to as natural origanum oil, and the other a synthetic oil produced from a coal-tar derivative. Both classes have the same uses, the principal one of which appears to be as perfume for soap.

Concededly, natural origanum oil is duty free, being classifiable under paragraph 1731 of the Tariff Act of 1930. As I understand the decision of the court below, it held that the synthetic product was also classifiable under that paragraph and, therefore, duty free. The majority here, however, hold that it is unnecessary to determine the dutiable status of the synthetic product, and with that I agree, although the protests make claims, in the alternative, under paragraph 1558, which had they been pressed might have rendered consideration of that paragraph proper had the record been such as to show the involved merchandise to be what I will designate as a straight synthetic product, meaning thereby a product produced wholly from a coal-tar derivative and not mixed or combined with a product produced otherwise, as, for example, a natural oil.

It would seem to be clear that in the case of protest 948193–G/4010, covering the shipment from Morocco, the collector did not regard the merchandise there involved as being either a natural origanum or a straight synthetic origanum oil, but treated it as a tariff entity distinct as such from either—that is, as a mixture or combination containing essential or distilled oil, or as a natural or synthetic odoriferous or aromatic substance. This appears from the collector's memorandum accompanying the transmission of the papers to the trial court.

The collector's memorandum in the case covered by protest 944578–G/1083 is not so clear upon this point, it stating that the merchandise was "classifiable as Oil of Origanum, a mixture of aromatic substances." That appears to couple two distinct tariff entities together. If the merchandise was "Oil of Origanum," whether

natural or straight synthetic, it would, as I view it, be a different tariff entity from "a mixture of aromatic substances."

However, in view of the manner in which the case was presented before us, I do not attribute any particular importance to the seeming discrepancy, so noted.

The Government presented the case here, as I understand its brief taken together with the oral argument, solely on the theory that the merchandise was a mixture of the character provided for in the third clause of paragraph 60, quoted in the majority opinion, while appellee contended that it was not such a mixture but was origanum oil entitled to free entry whether pure natural oil, or wholly synthetic oil.

As I understand the majority opinion, they do not undertake to determine whether the factual record shows the merchandise to have been what I refer to as a straight synthetic product, or to have been a mixture, but they hold upon the evidence, much of which is set forth, or fairly paraphrased, in the opinion, that while the importer may have made a *prima facie* showing sufficient to overcome the presumption of correctness of the collector's classification, the testimony on behalf of the Government satisfactorily rebutted the importer's *prima facie* case, and, since the burden was upon the importer, the collector's classification was sustained.

I do not wish here to foreclose myself from considering with an open mind the question of the proper dutiable status of a product obtained from mixing or combining pure natural origanum oil and straight synthetic origanum oil, no other substances than those being contained in such a mixture, should there be occasion to consider it, but upon the record in this case there is no occasion to consider it.

I confine myself in this dissent to the factual questions.

I deem it proper to say that, in my opinion, the evidence in this case establishes:

(1) That when the importer ordered the oils here involved, it desired, ordered, and expected to receive, natural origanum oils—that is, oils derived solely from plants or herbs; (2) that it would not have accepted, as a fulfillment of the order, origanum oils synthetically produced, knowing them to be such, nor would it have accepted a product composed of a mixture or combination of natural and synthetic oils, knowing the product to be such, and (3) that it accepted the involved shipments, believing the oils to be in conformity with its order.

However, the intent, order, desire, and act of acceptance of the importer cannot be held determinative of the proper classification of the merchandise. The actual character of the merchandise must control.

I think it proper to say further that it would be unreasonable to suppose that orthocresol (which concededly is not present in natural

origanum oil) would have been purposely introduced into the imported oils, if they were, in fact, natural oils, because orthocresol is an objectionable element.

The record embraces the testimony of a witness by the name of Paul Pinel whose depositions (one in each case) were taken on behalf of the importer upon interrogatories propounded by counsel for the importer and cross-interrogatories propounded by counsel for the Government. The depositions were taken in France in December, 1938, and they comprised the first evidence introduced on behalf of the importer. The witness described himself as chief chemical engineer in the employ of Bertrand Freres, a corporation of France, located at Grasse, engaged in the manufacture and sale of essential oils, including origanum oil. The qualifications of the witness were not called in question and his various experiences need not be detailed. He had had extensive experience in the production of natural origanum oil. Some of his testimony was in the nature of expert testimony, but that which I regard as of most importance here relates to his claimed actual knowledge of the character of the merchandise here involved.

It may be said that the fifty drums of oil shipped from Spain were shipped by "Distilleries Adrian & Klein S. A. of Benicarlo, Spain," and that from Morocco was shipped by "Société Marocaine d'Essences Aromatique S. a. r. l. S. M. E. A., 11 rue d'Oran á Meknes, Morocco."

The witness claimed to have personal knowledge of both the Moroccan and the Spanish shipments. He stated that he assisted in organizing the Moroccan company; that he was its technical adviser; that he went every year to Morocco to supervise the distillation of origanum oil; that he had knowledge of the shipment in question, and he described the method by which the oil so shipped was produced. The shipment was identified in direct interrogatory No. 15 in which he was asked if the company made the shipment, and answered affirmatively.

The following then ensued:

(16) Please state whether you have knowledge of the production of the merchandise described in Direct Interrogatory No. 15?—A. I have complete knowledge of this production.

\*        \*        \*        \*        \*        \*        \*

(19) If the answer to Direct Interrogatory No. 16 is in the affirmative, please state whether or not in the production of the imported merchandise described in Direct Interrogatory No. 15 any ingredient is added, admixed, or compounded with the natural product?—A. No; no product is added, admixed, or compounded with essential oil which is exported just as it is received when discharged from the stills.

The questions in the deposition, respecting the merchandise shipped from Spain, in general followed the order of those respecting the shipment from Morocco and the answers were, in effect, the same. The witness did not state what connection, if any, he may have had with

the Spanish company, but he did state that he was present when the oil embraced in the shipment was produced, and so obtained knowledge of it.

It seems to me that the testimony of this witness identified the involved merchandise and that it was unequivocally to the effect that it was natural origanum oil, obtained by distillation from plants, to which no other product had been added.

I find nothing in the testimony given in answer to cross-interrogatories which tends to throw any doubt upon the direct testimony respecting either the identification of the particular merchandise involved or its nature as an unmixed natural origanum oil.

In both depositions the witness, in answer to cross-interrogatories, stated that he was not in any way financially interested in the result or outcome of the suits, and nothing appears of record which would justify a doubt as to his credibility or veracity.

I give greater weight to the testimony of this witness than, apparently, is given it by the majority. He was the only witness in the case who had knowledge of what the imported merchandise actually was from personal observation of it. The testimony of the experts, both those called on behalf of the importer and those called on behalf of the Government, was, in the final analysis, opinion evidence based upon tests made of the oils after they had been imported, and the opinions of the witnesses called by the Government were in conflict with the opinions of those called by the importer. Furthermore, the tests made by the experts of the respective parties were, respectively, upon different bases, or by different plans, and I am unable to say which basis or plan was the correct one to use. I may say, however, that the plan used by the experts for the importer seems to have been the standard one usually applied in testing such oils, while that used by the experts for the Government was one originated by them and not commonly used. The experts' testimony (and, as of course, I do not reflect upon the veracity of any of them) might have been more helpful had the tests made by them followed the same plan. At any rate, I am influenced more by the testimony of one who stated what the merchandise was as a result of his observation of it in its making than I am by the opinion evidence.

For the reasons I have stated, I think the judgment of the trial court should be affirmed.